IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

CARMEN R. JIVIDEN,        )
                         )
    Plaintiff,       )
                         )
v.                     )     No. 07-2610
                         )
UNIVERSITY OF TENNESSEE,  )
                         )
    Defendant.       )

---

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Carmen R. Jividen ("Jividen") alleges sex-based discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq.  (See First Am. Compl. ¶¶ 38-48, ECF No. 17.)  Before the Court is Defendant University of Tennessee's (the "University") April 26, 2011 Motion for Summary Judgment.  (Def.'s Mot. for Summ. J., ECF No. 32.)  Jividen responded in opposition on June 8, 2011.  (Resp. to Mot. for Summ. J., ECF No. 38; Pl.'s Mem. in Resp. to Mot. for Summ. J., ECF No. 38-2 ("Resp.").)  For the following reasons, the University's motion is GRANTED.

I.  Background[1]

---

[1] Unless otherwise stated, all facts in the Background are undisputed for purposes of the University's Motion for Summary Judgment.

In 2001, Jividen began working at the University as a groundskeeper, where her duties included maintaining trees, flowers, and shrubs; weeding; trimming; and spraying chemicals. (Def.'s Statement of Undisputed Material Facts ¶ 1 ("Def.'s Statement"), ECF No. 32-1; Resp. to Def.'s Statement of Material Facts ¶ 1 ("Pl.'s Statement").)   In addition to Jividen, the University employed three male groundskeepers.   (See Def.'s Statement ¶ 2; Pl.'s Statement ¶ 2.)   Whit Sutton ("Sutton") was Jividen's supervisor during her employment at the University.[2] (Def.'s Statement ¶ 3.)   During her employment with the University, Jividen received marks of satisfactory and fair on her employment evaluations.   (Def.'s Statement ¶ 4; Pl.'s Statement ¶ 4.)

Jividen's claims are based in part on the University's promotion of a male co-worker instead of her.   When the University posted an opening for the position of Building Service Supervisor in 2006, Jividen and Barry Flanagan

---

[2] Jividen denies this fact and states that Sutton was her "direct supervisor" from 2001 to 2006 and in 2007, but that, from 2006 to 2007, Barry Flanagan was her "direct supervisor." (Pl.'s Statement ¶ 3.)   Under the local rules in this district, the party moving for summary judgment must include a statement of undisputed material facts with citations to the record showing those facts are not in dispute.   See W.D. Tenn. Civ. R. 56.1(a).   The party opposing the motion must respond to each fact by agreeing that the fact is undisputed or demonstrating that it is disputed "by specific citation to the record."   Id. 56.1(b).   Jividen does not cite to the record to show that whether Sutton was her supervisor during her employment at the University is disputed.   Therefore, that fact is deemed admitted.   See Akines v. Shelby Cnty. Gov't, 512 F. Supp. 2d 1138, 1147-48 (W.D. Tenn. 2007) (explaining that, where the non-moving party fails to follow the local rule in responding to a motion for summary judgment, courts in this judicial district "consider the [moving party's] statement of undisputed material facts as having been admitted").

("Flanagan") applied.  (Def.'s Statement ¶ 5; Pl.'s Statement ¶ 5; see Sutton Dep. Ex. 3, ECF No. 32-5 ("Job Summary").)  With input and approval from the University's Department of Human Resources ("Human Resources"), Sutton was responsible for deciding whether to promote Jividen or Flanagan to the position. (See Def.'s Statement ¶ 6; Pl.'s Statement ¶ 6.)

Because Sutton considered Jividen and Flanagan to have different strengths and weakness, he wanted to give each a trial period as supervisor before making his decision, but Human Resources would not approve that proposal.[3]  (Def.'s Statement ¶ 7.)  Having supervised both candidates, Sutton decided not to conduct extensive interviews; he asked each candidate a single question about how he or she might handle an emergency if Sutton had to miss work for two weeks and considered their answers "a wash."[4]  (Def.'s Statement ¶ 8.)  Sutton decided to promote Flanagan because his education, formal training, and supervisory experience made him better "on paper."[5]  (Def.'s Statement ¶ 9;

---

[3] Jividen denies this fact and states that she "has no personal knowledge" about Sutton's proposal or Human Resources' rejection of it, but she does not cite to record evidence showing that the fact is in dispute.  Therefore, it is deemed admitted.  See W.D. Tenn. Civ. R. 56.1; Akines, 512 F. Supp. 2d at 1147-48.

[4] Jividen denies this fact and states that she was asked what she would do if only one person or no one came to work on a particular day.  (Pl.'s Statement ¶ 8.)  Although Jividen cites various sources in the record, none of them addresses Sutton's interview.  Therefore, that Sutton asked her a single question about how she would handle an emergency in his absence is deemed admitted.  See W.D. Tenn. Civ. R. 56.1; Akines, 512 F. Supp. 2d at 1147-48.

[5] Jividen denies this fact and states that she has "no personal knowledge" about Flanagan's qualifications on paper and that she "believes she was more qualified and more knowledgeable about the standards and responsibilities that the Grounds Supervisor position required than Mr. Flanagan," but she

<u>see also</u> Sutton Dep. 33:15-34:4, 38:3-38:8, ECF No. 32-5.)   No
one told Jividen that Sutton selected Flanagan instead of her
because she was female.[6]   (See Def.'s Statement ¶ 10.)

   Jividen's claims are also based on her work environment.
In 2004 or 2005, Jividen complained about having to use a
restroom   outside   the   groundskeepers'   building.   (Def.'s
Statement ¶ 11.)   Jividen denies that characterization of her
complaint and says that she complained "about having to use an[]
outside male restroom."   (See Pl.'s Statement ¶ 11.)   She relies
on her deposition testimony where she states that, although the
restroom was not marked "male" or "female," it had a urinal in
addition to a toilet.   (See Jividen Dep. 43:18-44:4.)

   At the time of Jividen's complaint, the University's
groundskeepers worked out of a building known as the "garage"
and an adjacent storage facility.   (Jividen Dep. 43:15-18, Mar.
8, 2011, ECF No. 32-6.)   The restroom inside the garage had a
toilet, mirror, and running water.   The restroom in the storage
area had a toilet, urinal, and running water.   (<u>Id.</u> 43:19-44:3.)

---

does not deny that Sutton stated that he promoted Flanagan because of his
education, formal training, and supervisory experience.   (<u>See</u> Pl.'s Statement
¶ 9.)
[6] Jividen denies his fact and states that she was "told by Mr. Jackson, a
supervisor at the University of Tennessee . . . that Mr. Sutton told Mr.
Jackson that he had concerns with [Jividen's] ability to supervise men."
(Pl.'s Statement ¶ 10.)   Jividen does not cite to the record, and there is no
affidavit   or   deposition   testimony   from   "Mr.   Jackson"   or   affidavit   or
deposition testimony about Mr. Jackson's comments in the record.   Therefore,
that no one told Jividen that Sutton's selection was based on her sex is
deemed admitted.   <u>See</u> W.D. Tenn. Civ. R. 56.1; <u>Akines</u>, 512 F. Supp. 2d at
1147-48.

Sutton asked Jividen to use the restroom in the storage area and said he would put flowers in the urinal if should would agree. (See Def.'s Statement ¶ 12.)  The parties disagree about whether Sutton's offer to put flowers in the urinal was a joke. (Compare Def.'s Statement ¶ 12, and Sutton Dep. 29:2-8, with Pl.'s Statement ¶ 12, and Jividen Dep. 44:15-22.)

After Jividen filed a formal complaint about the restroom arrangment, the groundkeepers moved to a new building, the "physical plant." (Jividen Dep. 47:18-48:13.)  There, one of the indoor male restrooms was designated a women's restroom, and Jividen received the only key.  (Def.'s Statement ¶ 11; see Jividen Dep. 48:12-23.)  After receiving a key to her own restroom, Jividen was "fine" with the restrooms.[7]  (Def.'s Statement ¶ 12; Jividen Dep. 50:1-4.)

Sometime in 2007, after Sutton noticed that Jividen's legs and feet were blue from spraying chemicals, he instructed the groundskeepers to wear shoes and socks.[8]  (Def.'s Statement ¶ 15.)  Previously, Jividen and Flanagan had worn sandals occasionally.  Flanagan followed Sutton's instruction to begin

---

[7] Jividen denies the paragraph in which the University states this fact, but her response demonstrates that she denies only whether Sutton was joking about putting flowers in the urinal in her old restroom.  (See Pl.'s Statement ¶ 12.)  That Jividen was content with the restrooms in the physical plant is deemed admitted.  See W.D. Tenn. Civ. R. 56.1; Akines, 512 F. Supp. 2d at 1147-48.

[8] Jividen states that she has no knowledge of why Sutton decided to make employees wear shoes and socks, but does not cite evidence in the record showing that this fact is disputed.  (See Pl.'s Statement ¶ 15.)  It is deemed admitted.  See W.D. Tenn. Civ. R. 56.1; Akines, 512 F. Supp. 2d at 1147-48.

wearing shoes and socks.[9]  (Def.'s Statement ¶ 16.)  Jividen says
that she had been advised by a doctor to wear ventilated
footwear.  (Pl.'s Statement ¶ 15.)   Although the University's
Grounds Work Rules did not address footwear, the pesticides and
herbicides that the groundskeepers applied on campus had warning
labels advising users to wear shoes and socks.  (<u>See</u> Def.'s
Statement ¶ 17; Pl.'s Statement ¶ 17; Grounds Work Rules, ECF
No. 38-10.)

On July 19, 2007, Sutton noticed Jividen wearing
inappropriate footwear.  (Def.'s Statement ¶ 18.)   When he
instructed her to return her truck to the physical plant
compound, Jividen went to the Office of Equity and Diversity.
(<u>Id.</u>)  Jividen denies that her footwear was inappropriate, as it
had been ordered by her doctor.  (Pl.'s Statement ¶ 18; Jividen
Dep. 74:17-75:5.)   Jividen also denies that Sutton instructed
her to go to the compound.  (Pl.'s Statement ¶ 18.)  She says
that, while she was working in the University playground area,
Sutton yelled at her about her footwear and directed her to go
home without telling her what to do with her truck.  (<u>Id.</u>; <u>see</u>
Jividen Dep. 73:11-74:12.)

---

[9] Jividen denies the paragraph in which the University states these facts, but
she does not cite evidence in the record showing that they are in dispute.
(<u>See</u> Pl.'s Statement ¶ 16.)   That Jividen and Flanagan had worn sandals
before Sutton's instruction to wear shoes and socks and that Flanagan
followed Sutton's instruction are deemed admitted.  <u>See</u> W.D. Tenn. Civ. R.
56.1; <u>Akines</u>, 512 F. Supp. 2d at 1147-48.

After waiting for Jividen at the compound for several minutes, Sutton went in search of Jividen's truck and found it outside the Office of Equity and Diversity's building. (Def.'s Statement ¶ 19.) The truck had been parked in a fire lane near the entrance to a parking garage. (Sutton Dep. 46:15-22.) Sutton returned it to the compound.[10] (Def.'s Statement ¶ 19.)

On July 23, 2007, Sutton issued Jividen a letter of final warning about her refusing to wear shoes and socks and her failing to return her truck to the compound on July 19, 2007. (Def.'s Statement ¶ 20; Ex. 12, ECF No. 32-6.) Jividen does not deny that she received that letter, but disputes the bases for its issuance. (See Pl.'s Statement ¶ 20.) She explains that she was not insubordinate in refusing to wear shoes and socks because she was following her doctor's orders and that she was not disciplined for "the truck incident." (Id.)

On September 14, 2007, Sutton informed Jividen that, because she would be applying pesticides in the coming days, she needed to wear shoes and socks.[11] (Def.'s Statement ¶ 21.) Jividen wore inappropriate footwear on September 12, 14, 19, and

---

[10] Jividen denies these facts and states that Sutton followed her to the building and "took her work truck in a malicious manner to again hinder her ability to follow [his] instructions to her to go home." (Pl.'s Statement ¶ 19.) Although Jividen characterizes the event differently, the record evidence does not show that Sutton's waiting for Jividen at the compound, searching for and locating her truck, and returning it to the compound are in dispute. (See id.)

[11] Jividen denies this fact, but does not cite any record evidence showing that it is in dispute. (See Pl.'s Statement ¶ 21.) Therefore, it is deemed admitted. See W.D. Tenn. Civ. R. 56.1; Akines, 512 F. Supp. 2d at 1147-48.

27.[12]   (Def.'s Statement ¶ 21.)   On October 4, 2007, she was issued a letter stating that the University had terminated her employment for insubordination.   (Id.; see Ex. 21, ECF No. 32-6 ("Termination Letter").)   Jividen disputes that she had been insubordinate, but not that the University's October 4, 2007 letter stated insubordination as the reason for her dismissal. (See Pl.'s Statement ¶ 21.)

## II.   Jurisdiction

Because Jividen's claims arise under Title VII, this Court has federal question jurisdiction.   See 28 U.S.C. §§ 1331, 1343(a)(4); Harper v. AutoAlliance Int'l, 392 F.3d 195, 201 (6th Cir. 2004) (stating that Title VII claims arise under federal law).

## III. Standard of Review

Under Federal Rule of Civil Procedure 56, on motion of a party, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine [dispute] of material fact, and the evidence as well as all inferences drawn therefrom must be read

---

[12] Jividen denies that she wore inappropriate footwear in September 2007, but she does not cite record evidence showing that there is a dispute about that fact.   Therefore, it is deemed admitted.   See W.D. Tenn. Civ. R. 56.1; Akines, 512 F. Supp. 2d at 1147-48.

in a light most favorable to the party opposing the motion."
Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.
1986); see Fed. R. Civ. P. 56(a).   The moving party can meet
this burden by pointing out to the court that the respondent,
having had sufficient opportunity for discovery, has no evidence
to support an essential element of her case.   See Fed. R. Civ.
P. 56(c)(2); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479
(6th Cir. 1989).

When confronted with a properly supported motion for
summary judgment, the respondent must set forth specific facts
showing that there is a genuine dispute for trial.   See Fed. R.
Civ. P. 56(c).   A genuine dispute for trial exists if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.   See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).   The nonmoving party must "do more
than simply show that there is some metaphysical doubt as to the
material facts."   Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586 (1986).   One may not oppose a properly
supported summary judgment motion by mere reliance on the
pleadings.   See Celotex Corp. v. Catrett, 477 U.S. 317, 324
(1986).   Instead, the nonmovant must present "concrete evidence
supporting [her] claims."   Cloverdale Equip. Co. v. Simon
Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989) (citations
omitted); see Fed. R. Civ. P. 56(c)(1).   The district court does

not have the duty to search the record for such evidence. <u>See</u>
Fed. R. Civ. P. 56(c)(3); <u>InterRoyal Corp. v. Sponseller</u>, 889
F.2d 108, 111 (6th Cir. 1989). The nonmovant has the duty to
point out specific evidence in the record that would be
sufficient to justify a jury decision in her favor. <u>See</u> Fed. R.
Civ. P. 56(c)(1); <u>InterRoyal Corp.</u>, 889 F.2d at 111. "Summary
judgment is an integral part of the Federal Rules as a whole,
which are designed to secure the just, speedy, and inexpensive
determination of every action[,] rather than a disfavored
procedural shortcut." <u>FDIC v. Jeff Miller Stables</u>, 573 F.3d
289, 294 (6th Cir. 2009) (internal quotation marks and citations
omitted).

**IV.  Analysis**

Title VII forbids employers from discriminating against
"any individual with respect to [her] compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e-2(a)(1). Jividen alleges that the University
violated Title VII by failing to promote her and terminating her
on the basis of sex, retaliating against her for complaining
about her work conditions, and creating a hostile work
environment based on sexual harassment. (<u>See</u> Am. Compl. ¶¶ 38-
48.)

**A. Sex-based Discrimination**

A plaintiff may use direct or circumstantial evidence to establish a prima face case of sex-based discrimination. See Risch v. Royal Oak Police Dep't, 581 F.3d 383, 390 (6th Cir. 2009) (citation omitted). Where a plaintiff lacks direct evidence, the burden-shifting framework of McDonnell Douglas Corporation v. Green, 441 U.S. 792 (1973), as modified by Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) applies. See Risch, 581 F.3d at 390; cf. Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (citations omitted). To establish a prima facie case of sex-based discrimination, a plaintiff must show (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly situated male employees. See McClain v. Northwest Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 332 (6th Cir. 2006). If the plaintiff establishes a prima facie case, the burden shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for its action. See Risch, 581 F.3d at 390; McClain, 440 F.3d at 332. If the employer carries its burden, the employee must proffer evidence from which a reasonable jury could conclude that the employer's stated reason is pretextual. See Risch, 581 F.3d at 391; McClain, 440 F.3d at 332.

Jividen bases her claim for sex-based discrimination on the University's decision to promote Flanagan to Building Service Supervisor instead of her and its decision to terminate her employment. (See Resp. 5-8.) Because there is no dispute that Jividen lacks direct evidence that the University took those actions on the basis of her sex, she must rely on circumstantial evidence.

For purposes of summary judgment, the University admits that Jividen can establish a prima facie case of discrimination based on its failure to promote her. (See Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 2-3, ECF No. 32-2.) ("Mem.") Therefore, it has the burden of articulating a legitimate, nondiscriminatory reason for its action. See Risch, 581 F.3d at 390; McClain, 440 F.3d at 332. To meet that burden, the University states that it promoted Flanagan instead of Jividen because Sutton, the decision-maker, considered him to be the better-qualified candidate. (Mem. 3.)

The University's stated reason has support in the record. The job description provided, in part:

> The Building Service Supervisor will supervise the maintenance of the University grounds and properties. REQUIREMENTS: Associates Degree with an emphasis on or Horticulture Science preferred; four (4) years grounds maintenance/gardening with experience to include (2) years supervisory OR a combination of education and related work experience to equal eight (8) years.

12

(See Job Summary.) Flanagan held a bachelor's degree and was scheduled to complete a "master gardener" program in August 2006. (See Ex. 5, ECF No. 32-5.) ("Flanagan Application") Before joining the grounds staff in 2001, he had also supervised researchers in other positions at the University. (Id.) Jividen had significant gardening and landscaping experience and had supervised others in the Tennessee National Guard, but she had less education, formal training, and supervisory experience. (See Ex. 8, ECF No. 32-5.) ("Jividen Application") Sutton ultimately chose Flanagan because his education, formal training, and supervisory experience made him "much better qualified on paper." (See Sutton Dep. 33:15-34:4, 37:21-39:16.) That is a legitimate, nondiscriminatory reason for the University's promoting Flanagan.

Because the University has articulated a legitimate, nondiscriminatory reason for promoting Flanagan, Jividen must show that its reason is pretextual. See Risch, 581 F.3d at 391; McClain, 440 F.3d at 332. "A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." Upshaw, 576 F.3d at 586 (citation omitted). To survive summary judgment, a plaintiff need only rebut the employer's proffered reason; she

13

need not disprove it.  Id.; see also Ross v. Pfizer, Inc., 375 F. App'x 450, 454 (6th Cir. 2010) (citation omitted).

Jividen contends that Sutton's conducting a one-question interview of both candidates and the University's criticizing that form of interview show that the University's proffered reason did not actually motivate its decision.  (See Resp. 6.) The record demonstrates that University investigated Sutton's selection process and expressed concerns about the interview. (See Ex. 14, ECF No. 38-14; Ex. 15, ECF No. 38-15 ("Report").) However, Sutton testified that Jividen's and Flanagan's responses to his interview question were "a wash" and that neither was "extremely great."  (Sutton Dep. 37:14-20.)  Sutton also testified that he ultimately chose Flanagan because of his education, formal training, and supervisory experience.  (Id. at 37:21-39:16.)  Because those characteristics made Flanagan "much better qualified on paper," the interview process did not materially affect Sutton's decision.  (See id.)  That Sutton's interview process might have been flawed by the University's human resources standards does not show that Flanagan's education, formal training, and supervisory experience were not the reasons for his promotion.

Although she does not explain whether they show that the University's proferred reason "did not actually motivate the challenged conduct" or that it "is insufficient," Upshaw, 576

14

F.3d at 586 (citation omitted), Jividen directs the Court to other facts that she contends show the reason is a pretext for discrimination. (See Resp. 6-7.) She emphasizes that Flanagan had been employed the University's psychology department as a research assistant before joining the grounds team and that she had more experience as a University groundskeeper than Flanagan.[13] (See id.) She also asserts that she was denied the promotion after she had complained about "unfair treatment and harassment, particularly regarding Sutton." (Id. at 7.)

Where a plaintiff seeks to compare her qualifications to the candidate chosen for a position,

> relative qualifications may establish a triable issue of fact as to pretext if the evidence shows that either (1) the plaintiff's qualifications "were so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former," or (2) the plaintiff was "as qualified as or better qualified than the successful applicant" and the record also contains "other probative evidence of discrimination."

Ross, 375 F. App'x at 454 (citation omitted); see Risch, 581 F.3d at 392 ("When the plaintiff offers other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's

---

[13] Jividen actually asserts that Flanagan was not employed in a horticulture-related position before he was promoted to Building Service Supervisor. (See Resp. 6.) However, the only evidence in the record about Flanagan's employment history shows that he had been employed in the grounds department since 2001. (See Sutton Dep. 33:1-16; Flanagan Application.)

claim surviving summary judgment." (citation and internal quotation marks omitted).)

Jividen has not shown that her qualifications "were so significantly better than the successful applicant's qualifications that no reasonable employer" would have chosen Flanagan instead of her. See Ross, 375 F. App'x at 454. She had worked in landscaping for a variety of entities and had run her own business, but she had not completed college, had little formal training, and her only supervisory experience was as a member of the Tennessee National Guard in the 1980s. (See Jividen Application.) By contrast, Flanagan had less experience in landscaping and horticulture, but he had a college degree, was enrolled in a master gardener program, and had supervised employees in a previous position at the University. (See Flanagan Application.) Sutton recognized that Jividen and Flanagan had different strengths and weaknesses when he proposed giving each a trial run as Building Service Supervisor—an idea Human Resources vetoed. (See Def.'s Statement ¶ 7.) Although Jividen has shown that her qualifications were different from Flanagan's, she has not shown that she was "so significantly better" qualified "that no reasonable employer would have chosen" him. See Ross, 375 F. App'x at 454.

Jividen has not shown that she was "as qualified or better qualified than" Flanagan. See Ross, 375 F. App'x at 454. Title

VII does not "not diminish lawful traditional management prerogatives in choosing among qualified candidates, and an employer has great [ ] flexibility in choosing a management-level employee." Browning v. Dep't of Army, 436 F.3d 692, 696 (6th Cir. 2006) (citation and internal quotation marks omitted); see Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987) ("So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates[.]" (citations omitted)). An employer's decision to weigh one factor more heavily than another "is simply not sufficient to demonstrate pretext." Browning, 436 F.3d at 697.

In considering candidates for Building Service Supervisor, the University, acting through Sutton, decided that education, formal training, and supervisory experience were important criteria, and there is no dispute that Flanagan had more education, formal training, and supervisory experience than Jividen. (See Sutton Dep. 37:21-39:16; Flanagan Application; Jividen Application.) Although those criteria might have been the wrong ones to use in selecting a Building Service Supervisor, Title VII "does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 626 (6th Cir. 2006) (citation omitted). Because Jividen cannot show that she was as qualified as Flangan based

17

on the University's criteria, her qualifications evidence does not show that the University's decision to promote Flanagan was pretextual.  See Ross, 375 F. App'x at 454; Risch, 581 F.3d at 392.  To the extent she relies on the University's promotion of Flanagan, Jividen's claim of sex-based discrimination cannot survive summary judgment.

Addressing Jividen's alternative theory that the University discriminated against her on the basis of sex in deciding to terminate her, the University also concedes, for purposes of summary judgment, that Jividen can establish a prima facie case of sex-based discrimination.  (See Mem. 5-6.)  Therefore, it has the burden of articulating a legitimate, nondiscriminatory reason for its action.  See Risch, 581 F.3d at 390; McClain, 440 F.3d at 332.  To meet that burden, the University states that it terminated Jividen's employment for insubordination.  (Mem. 3.)

The University's reason has support in the record.  After Sutton instructed Jividen and the other groundskeepers to wear shoes and socks, Jividen continued to wear sandals and other inappropriate footwear.  (See Def.'s Statement ¶ 18; Sutton Dep. 44:13-24.)  On July 19, 2007, when Sutton noticed Jividen wearing sandals, he directed her to meet him at the compound with her truck.  (See Def.'s Statement ¶ 18; Sutton Dep. 44:13-24.)  Although Jividen states that Sutton directed her to go home and gave her no instructions about her truck, there is no

18

dispute that she did not follow Sutton's directive and instead went to the building housing the Office of Equity and Diversity, where she left her unlocked truck parked in a fire lane, with unsecured University equipment inside and outside the truck. (Pl.'s Statement ¶ 19; Sutton Dep. 46:1-48:16.) After Jividen repeatedly wore sandals in September 2007, the University terminated her employment. (See Def.'s Statement ¶ 21.) Because evidence shows that Jividen continued to wear sandals after repeated directives to wear shoes and socks and ignored Sutton's directive on July 19, 2007, the record supports the University's proffered reason that it terminated her for insubordination.

Because the University has articulated a legitimate, nondiscriminatory reason for terminating her, Jividen must demonstrate that its reason is a pretext by showing that it has no basis in fact, did not actually motivate the University's decision, or is insufficient to explain her termination. See Upshaw, 576 F.3d at 586 (citation omitted). Jividen does not explain on which of those theories she relies, but she directs the Court to various facts that she contends show the University's proffered reason for her termination is pretextual. (See Resp. 7-8.) She states that she had a medical reason for wearing sandals, that there is no description of required

footwear in the Grounds Work Rules, and that other groundskeepers wore inappropriate footwear. (See id.)

None of those facts demonstrates that the University's reason for terminating Jividen has no basis in fact, did not actually motivate its decision, or is insufficient to support its decision. See Upshaw, 576 F.3d at 586 (citation omitted). To the extent that Jividen implies she was not insubordinate in continuing to wear sandals because she had a medical excuse for not wearing shoes and socks, nothing in the record demonstrates that she discussed her medical condition with Sutton. Even if she had, that would not excuse her from following Sutton's directive, which was based on manufacturers' warning labels on the chemicals that Jividen and other groundskeepers were applying. (See Def.'s Statement ¶ 17; Pl.'s Statement ¶ 17.) That Jividen had a medical reason for wearing sandals does not show that the University's proffered reason for terminating her is pretextual.

That the University's written policies did not address footwear for groundskeepers does not show that the University's proferred reason for terminating Jividen is pretextual. According to the University's Code of Conduct, "Prohibited behaviors include . . . refusal of an employee to follow instructions . . . or to comply with directives of authorized university officials." (Ex. 10, ECF No. 38-10.) There is no

dispute that Sutton directed the groundskeepers to wear shoes and socks and that Jividen repeatedly failed to do so. That Sutton's directive was not itself in the Code of Conduct is not material.

To the extent Jividen asserts that other groundskeepers were not terminated for wearing similar footwear, she does not name those groundskeepers or cite any record evidence supporting her assertion. (See Resp. 8.) The only evidence in the record is that Flanagan wore sandals before Sutton directed the groundskeepers to wear shoes and socks. (See Def.'s Statement ¶ 16.) Nothing in the record demonstrates that Flanagan or any other groundskeeper continued to wear sandals after Sutton's directive. Jividen's assertion to the contrary lacks record support.

The University has articulated legitimate, nondiscriminatory reasons for its decisions to promote Flanagan and to terminate Jividen. Jividen has not shown that those reasons are pretext for sex-based discrimination. Therefore, the University is entitled to summary judgment on Jividen's claim of sex-based discrimination.

### B. Retaliation

Title VII bars employers from retaliating against employees for engaging in protected activities. See 42 U.S.C. § 2000e-3(a). Where a plaintiff relies on circumstantial evidence to

show   retaliation,   the   <u>McDonnell   Douglas</u>   burden-shifting
framework   applies.   <u>See</u>   <u>Upshaw</u>,   576   F.3d   at   588   (citations
omitted).   To   establish   a   prima   face   claim   for   retaliation,   a
plaintiff   must   show   that:

> (1)   she   engaged   in   activity   protected   by   Title   VII;
> (2)   this   exercise   of   protected   rights   was   known   to
> defendant;   (3)   defendant   thereafter   took   adverse
> employment   action   against   the   plaintiff,   or   the
> plaintiff   was   subjected   to   severe   or   pervasive
> retaliatory   harassment   by   a   supervisor;   and   (4)   there
> was   a   causal   connection   between   the   protected   activity
> and   the   adverse   employment   action   or   harassment.

<u>Michael v. Caterpillar Fin. Servs. Corp.</u>, 496 F.3d 584, 595 (6th
Cir. 2007) (citing <u>Morris v. Oldham County Fiscal Court</u>, 201
F.3d 784, 792 (6th Cir. 2000)).

Jividen   bases   her   retaliation   claim   on   the   University's
decisions   to   promote   Flanagan   to   Building   Service   Supervisor
instead   of   her   and   to   terminate   her   employment.   (<u>See</u>   Resp.   5-
8.)   Because   there   is   no   dispute   that   Jividen   lacks   direct
evidence   that   the   University   took   those   actions   in   retaliation
for   her   engaging   in   Title   VII-protected   activity,   she   must   rely
on   circumstantial   evidence.   As   on   Jividen's   discrimination
claim,   for   purposes   of   summary   judgment,   the   University   admits
that   Jividen   can   establish   a   prima   facie   case   of   retaliation
based   on   its   failure   to   promote   her   and   its   termination   of   her
employment.   (<u>See</u>   Mem.   2-3,   5.)   Therefore,   the   University   has
the   burden   to   show   legitimate,   nonretaliatory   reasons   for   its

actions.   See Harris v. Metro. Gov't of Nashville & Davidson
Cnty., 594 F.3d 476, 485 (6th Cir. 2010) (citation omitted).

As noted, the University has articulated a legitimate,
nondiscriminatory reason for promoting Flanagan—that he had more
education, formal training, and supervisory experience than
Jividen.   The University has also articulated a legitimate,
nondiscriminatory reason for terminating Jividen—that she was
insubordinate.   Because those reasons are also non-retaliatory,
Jividen has the burden of showing that the University's
proffered reasons are a pretext for retaliation.   See Harris,
594 F.3d at 485.

Jividen's argument that the University's proffered reason
for promoting Flanagan instead of her is a pretext for
retaliation is identical to her argument that the reason is a
pretext for discrimination.   (See Resp. 5-7.)   Just as that
argument does not show that the University's stated reason was a
pretext for discrimination, it does not show that it was a
pretext for retaliation.    To the extent Jividen bases her
retaliation claim on the University's failure to promote her, it
fails.

Much of Jividen's argument that the University's proferred
reason for terminating her is a pretext for retaliation overlaps
with her argument that the University's reason is a pretext for
sex-based discrimination.   (See Resp. 7-8.)   However, Jividen

also asserts that her termination "was issued after she lodged complaints against management within her department" and "very soon" after she filed a charge against the University with the Equal Employment Opportunity Commission ("EEOC"). (Id. at 8.)

Evidence of temporal proximity between an employee's Title VII-protected activity and her termination is generally considered evidence of a causal connection for the purpose establishing a prima facie case of retaliation. See Eades v. Brookdale Senior Living, Inc., 401 F. App'x 8, 13 (6th Cir. 2010). A plaintiff may rely on "temporal proximity in the pretext analysis as indirect evidence to support a pretext claim and rebut [a] proffered non-discriminatory reason for an adverse employment action." Id.; Asmo v. Keane, Inc., 471 F.3d 588, 598 (6th Cir. 2006) (citations omitted). That said, temporal proximity alone cannot prove pretext. See Brown v. City of Franklin, No. 10-5107, 2011 WL 2558768, at *4 (6th Cir. June 28, 2011); Burks v. Yellow Transp, 258 F. App'x 867, 875 (6th Cir. 2008) (citations omitted). The Court of Appeals for the Sixth Circuit has held, in a case involving only six weeks between an employee's protected activity and an employer's adverse actions, that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001).

24

Other than temporal proximity, Jividen does not direct the Court to any record evidence showing that the University's preferred reason for her termination was a pretext for retaliation.  She does not state which complaints she relies on to support her temporal proximity argument.  (See Resp. at 8.) Jividen complained about her assigned restroom in 2004 or 2005. (Def.'s Statement ¶ 11.)  She filed a charge with the EEOC in December 2006.  (See Ex. 13, ECF No. 38-13.)  On July 19, 2007, the same day Sutton reprimanded her for wearing inappropriate footwear, Jividen went to the Office of Equity and Diversity, where she presumably lodged a complaint about Flanagan's "stalking" her on campus.  (See Def.'s Statement ¶ 18; Pl.'s Statement ¶ 18; Jividen Dep. 74:17-75:5; Ex. 6, ECF No. 38-6.)

Assuming that Jividen bases her argument on her July 19, 2007 complaint, approximately ten weeks elapsed between her most recent protected conduct and her termination on October 4, 2007. (Compare id., with Termination Letter.)  That is significantly more than the six weeks the Sixth Circuit concluded was insufficient to show pretext based on temporal proximity in Skrjanc, 272 F.3d at 317.  Therefore, Jividen's argument that the University's preferred reason for her termination is pretextual because the termination occurred in close proximity to Title VII-protected conduct is not well-taken.

25

The University has articulated legitimate, nonretaliatory rreasons for promoting Flanagan and terminating Jividen. Jividen has not shown that those reasons are pretext for reltation. Therefore, the University is entitled to summary judgment on Jividen's retaliation claim.

### C. Hostile Work Environment

Title VII provides employees protection from a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation omitted). To establish a prima facie case of hostile work environment based on sex, a plaintiff must show:

> (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability.

Thornton v. Fed. Express Corp., 530 F.3d 451, 455 (6th Cir. 2008); see also Grace v. USCAR, 521 F.3d 655, 678 (6th Cir. 2008) (citations omitted).

In support of her hostile work environment claim, Jividen emphasizes that she was the only female in her department, that she was not provided a proper restroom facility until she lodged

26

a complaint against the University, that Sutton told her that he would put flowers in the urinal of her current restroom to appease her, and that Sutton yelled at her for wearing inappropriate footwear and moved her truck on July 19, 2007. (See Resp. 9.)  Although none of those allegations involves conduct that is explicitly sexual, "the law recognizes that non-sexual conduct may be illegally sex-based where it evinces anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." Williams v. GMC, 187 F.3d 553, 565 (6th Cir. 1999) (citations omitted).  To establish the third element of a hostile work environment claim, however, the Sixth Circuit "has specifically held that . . . if the conduct in question is 'non-sexual,' the plaintiff must show that but for [her] sex, [s]he would not have been the object of harassment." Simpson v. Vanderbilt Univ., 359 F. App'x 562, 572 (6th Cir. 2009) (citing Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000)); see also Pusey v. United Parcel Service, Inc., 393 F. App'x 366, 369 (6th Cir. 2010) (citation omitted).

Even assuming that Jividen alleges sexual conduct and that the third element of her claim has been met, she has failed to show that the harassment she suffered created a hostile work environment.  To prove the fourth element, a plaintiff claiming sexual harassment must establish that the workplace was

"permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21; see Thornton, 530 F.3d at 455 (citation omitted).   In deciding whether alleged harassment is sufficiently severe or pervasive to be actionable, a court considers the totality of the circumstances.   Williams, 187 F.3d at 562(citation omitted); see also Hensman v. City of Riverview, 316 F. App'x 412, 416-17 (6th Cir. 2009).   Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Thornton, 530 F.3d at 455 (citing Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999)); see also Cecil v. Louisville Water Co., 301 F. App'x 490, 499 (6th Cir. 2008) (citation omitted).   "The conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Thornton, 530 F.3d at 455 (citation omitted); see Harris, 510 U.S. at 21-22.

Jividen does not allege that she experienced frequent incidents of alleged harassment.   See Thornton, 530 F.3d at 455.

Although she was employed at the University from 2001 through 2007, Jividen describes a handful of allegedly discriminatory incidents: her having to use an inappropriate restroom until she filed a complaint, Sutton's comment about putting flowers in a urinal, and Sutton's actions toward her on July 19, 2007.  Three incidents of harassing conduct over six years do not constitute severe or pervasive conduct.  See Bowman, 220 F.3d at 464 (concluding that five incidents of harassing conduct occurring over five-year period did not constitute severe or pervasive conduct).

Jividen did not testify that any of the allegedly discriminatory incidents were physically threatening or humiliating.  See Thornton, 530 F.3d at 455.  After receiving a key to her own restroom, Jividen was "fine" with the restroom situation.  (See Def.'s Statement ¶ 12; Jividen Dep. 50:1-4.) Although Sutton yelled at Jividen about her improper footwear on July 19, 2007, nothing suggests that she felt physically threatened. (See Jividen Dep. 73:11-73:21.)

Nothing in the record suggests that any of the allegedly discriminatory incidents affected Jividen's performance.  See Thornton, 530 F.3d at 455.  Throughout her employment, she received employment evaluations that were satisfactory and fair. (Def.'s Statement ¶ 4; Pl.'s Statement ¶ 4.)

Viewed as a whole, Jividen's work environment was not objectively hostile or abusive. Thornton, 530 F.3d at 455 (citation omitted); see Harris, 510 U.S. at 21-22. Isolated incidents like those alleged by Jividen are not conduct sufficient "to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Because Title VII is not a "code of workplace civility," the incidents Jividen alleges are insufficient to establish the fourth element of her claim for hostile work environment. See id.; Thornton, 530 F.3d at 455.

Jividen has not established a prima facie claim for hostile work environment. Therefore, the University is entitled to summary judgment on that claim.

**V.   Conclusion**

For the foregoing reasons, the Court GRANTS the University's motion for summary judgment on Jividen's claims.

So ordered this 11th day of July, 2011.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR
UNITED STATES DISTRICT JUDGE

30